UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

COURTNEY F.,

                Plaintiff,

      -against-                                    5:18-CV-0047 (LEK)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On January 11, 2018, plaintiff Courtney F. filed an action in this Court under the Social Security Act. Dkt. No. 1 ("Complaint"). She seeks review of the determination of the Commissioner of Social Security that she was not disabled from February 8, 2013 through the date of the Administrative Law Judge's ("ALJ's") decision on September 23, 2016. Dkt. Nos. 13 ("Plaintiff's Brief"), 14 ("Record"), 15 ("Defendant's Brief"). For the reasons that follow, the Commissioner's determination of no disability is vacated, and the matter is remanded for further proceedings.

## II. LEGAL STANDARD

### a. Standard of Review

When a district court reviews an ALJ's decision, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d

28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A court will defer to the ALJ's decision if it is supported by substantial evidence, "even if [the court] might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, a court should not uphold the ALJ's decision—even when there is substantial evidence to support it—if it is based on legal error. Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998).

### b. Standard for Benefits

According to Social Security Administration ("SSA") regulations, a disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984). To determine a claimant's eligibility for disability benefits, there is a five-step evaluation process. 20 C.F.R. § 404.1520(a)(1). If the ALJ is able to determine that the claimant is disabled or not disabled at a step, the evaluation ends. § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. Id.

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful work activity." § 404.1520(a)(4)(i). If so, the claimant is not disabled under SSA regulations. Id. At step two, the ALJ must determine whether the claimant has an impairment, or combination of impairments, that is "severe," i.e., that "significantly limits" the claimant's "physical or mental ability to do basic work activities." §§ 404.1520(a)(4)(ii), 416.920(c). If the claimant does not have such an impairment, the claimant is not disabled under SSA standards. Id.

At step three, the ALJ asks whether the claimant's medically determinable physical or mental impairment(s) are as severe as an impairment listed in Appendix 1 of Subpart P of § 404. § 404.1520(a)(4)(iii); 20 C.F.R., Pt. 404, Subpt. P, App. 1. If so, the claimant is disabled. Id. If not, the ALJ moves on to step four and reviews the claimant's residual functioning capacity ("RFC") and past work. § 404.1520(a)(4)(iv). A claimant is not disabled under SSA standards if she can perform past work. Id. If the claimant cannot perform her past work, the ALJ decides at step five whether adjustments can be made to allow the claimant to work in a different capacity. § 404.1520(a)(4)(v). If the claimant "cannot make an adjustment to other work," then the claimant is disabled under SSA standards. Id. In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

### III.   BACKGROUND

#### a. The Disability Allegations and Evidence

Plaintiff is a thirty-year-old woman with a high school education. R. at 17. She worked as a developmental aide for five years, but has no recorded earnings since 2010, well before the alleged onset date of February 8, 2013. Id. Plaintiff sought a finding of disability due to back disorder with nerve damage, bipolar disorder, anxiety, left eye blindness, depression, and insomnia. Id. at 111, 123.

##### i. *Plaintiff's Testimony*

Plaintiff testified that she stopped working as a developmental aide in 2010 after she injured her back. R. at 82. She slipped on a printer tray and fell on concrete, hitting her back and hip. Id. at 88. She was immediately in "excruciating pain" and went to the hospital either that night or the next day. Id. at 89. She also filled out an incident report at work and filed a worker's compensation claim. Id. She was prescribed medications and eventually referred to a pain

3

management clinic. Id. She received nerve blocks at the pain management clinic, but they caused her more pain, and she ended up "bouncing around to different doctors" for several years. Id. at 89–90. She became addicted to painkillers and put herself into rehab. Id. at 98–99. She was eventually discharged from the outpatient rehab because she did not want to be put on Suboxone or Methadone and "counteract one drug with another." Id. at 99. She has not seen anyone for pain management "in over a year or two," id. at 89–90, and does not take any medications other than heat packs and Tylenol, id. at 86, 92. She smokes a pack of cigarettes every three days. Id. at 87.

Plaintiff started feeling depressed within a year after her injury, and she has taken medication for depression in the past. Id. at 97–98. She states, however, that once she was discharged from the aforementioned rehab outpatient facility, she was no longer able to receive medication for depression. Id. at 99.

Plaintiff had gastric bypass surgery in February 2016, with the hope that losing weight "would relieve a lot of the pressure off [Plaintiff's] back." Id. at 91. She lost 100 pounds in seven months, but it has not significantly improved her back pain—she stated she "can sit for maybe two or three minutes longer" than she could before the surgery. Id. at 92. Plaintiff described her back pain as follows:

> It goes from the middle of my back. The worst part is from the middle of my back down, in through both of my legs. It's a tingling, burning, aching, constant pain that's always there. It does radiate up into my shoulders, and it gets worse with weather. When it's cold or rainy my bones will ache and I can barely move when that -- when it's like that.

Id.

Plaintiff lives with her retired parents and her nine-year old son. Id. at 82–83. While her parents do most of the housework, she tries "to help as much as possible" and will occasionally wash dishes or put clothes into the laundry, but she "really cannot bend over," carry baskets of clothes, or stand at the sink for longer than fifteen minutes. Id. at 84. She can sweep but cannot bend down to pick items off the floor. Id. at 94. She cannot vacuum because it puts too much strain on her back. Id. She also has trouble getting in and out of bed. Id. at 84. Plaintiff "will occasionally try to sit down and read" and watches a little television, but she has to get up and walk around during commercials. Id. at 85. She no longer socializes with any friends or relatives. Id. She drove herself to the hearing, and typically drives two to three times a week, primarily to take her son to karate. Id. at 85–86. She shops at a convenience store, but she avoids grocery stores because she "can't walk through the aisles very long." Id. at 86. Plaintiff stated she could walk "[m]aybe half a block" before she would need to "stop and lean up against something," and she would need to rest for at least ten to fifteen minutes before she could start walking again. Id. at 95. She can lift five to ten pounds if the object is on a waist-high table, but cannot lift anything from the floor or from a cabinet above her head. Id. at 95–96. She is able to use the toilet and shower, but she uses a bar and shower chair for assistance. Id. at 87. Plaintiff needed to stand twice during her testimony. Id. at 86, 99.

In sum, Plaintiff stated that she used to be "a very happy down to earth, fun-loving, outgoing person. I was always out doing various activities, taking my son to the park, playing on the playgrounds and stuff with him. And, I physically can't do any of that anymore." Id. at 87.

    *ii. Medical History*

After falling at work on June 10, 2010, Plaintiff had X-rays of the lumbrosacral spine taken the next day, which were negative. R. at 514. On July 15, 2010, a nerve conduction study

showed "mild lower peripheral neuropathy" and "possible left lumbosacral radiculopathy" by an asymmetric Hoffman's reflex.[1] R. at 457. In August 2010, a lumbar MRI showed "broad left paracentral disc herniation minimally indenting the ventral margin of the thecal sac and causing slight posterior displacement of the left L5 nerve root and mild left lateral recess stenosis," as well as "a central disc herniation extending into the ventral epidural fat at the L5-S1 level." Id. at 463. The MRI also showed a bony fusion extending from T10–T12 of "uncertain etiology." Id. at 464.

On June 17, 2013, Plaintiff was treated by Dr. Martin Schaeffer for pain management, who noted that manual muscle testing revealed global weakness in bilateral lower extremities, that sensation was intact and symmetric, and that ambulation was slow though independent. R. at 382. Dr. Schaeffer found Plaintiff to be 75% disabled for the purposes of worker's compensation. Id. On August 14, 2013, an MRI of the lumbar spine showed degenerative disc disease and circumferential bulging of the discs at L4-5 and L5-S1 without neural impingement, findings that "do not appear significantly changed compared to the examination of 4/25/12." Id. at 526. In July and September 2013, Plaintiff saw Margaret Donovan, a nurse practitioner, who noted that Plaintiff "has had multiple injections through an outside pain clinic with limited response" and that Plaintiff "continues on her current medication regime and is a candidate for

---

[1] The ALJ and Plaintiff both reference this examination, but while Plaintiff states that it took place on June 15, 2010, the ALJ states the examination took place on July 13, 2011. Id. at 23; Pl.'s Br. at 2. While the page in the medical record immediately preceding the page that documents this examination lists the July 13, 2011 date, id. at 456, the next page lists a "study date" of July 15, 2010, id. at 457. Whether the document is referencing a previous study or the documents are simply not in chronological order, it appears that the study itself was conducted on July 15, 2010.

6

lumbar facet procedures." Id. at 378. At the time, Plaintiff was taking Percocet, Motrin, Cymbalta, and Norflex. Id. at 379.

On November 20, 2013, Plaintiff saw Scott Burnside, a nurse practitioner, who noted it was likely Plaintiff had unipolar depression with "underlying strong borderline personality disorder traits account[ing] for the bipolar like symptoms" that Plaintiff had described. R. at 393.

On December 26, 2013, Plaintiff saw Dr. Luciana Curia about her back pain. Id. at 558. Dr. Curia noted that previous treatment had provided no relief and that the pain appeared to be worsening. Id. Noting that Plaintiff "may have opioid induced hyperalgesia due to needing high doses of Percocet," she suggested that Plaintiff's primary care provider taper her off Percocet and prescribe Clonidine. Id. at 559–60.

On February 27, 2014, Plaintiff saw Dr. Suzanne Lamanna, her treating family practitioner, who assessed Plaintiff as having vitamin D deficiency, depressive disorder, and chronic pain syndrome. R. at 362. An April 23, 2014 exam by Carol Scalzo, a nurse practitioner working for Dr. Lamanna, noted that patient was healthy, had no signs of apparent distress, and had good mobility of all extremities. Ms. Scalzo assessed Plaintiff with chronic pain syndrome, lumbago, neuralgia/neuritis/radiculitis (unspecified), depressive disorder, obesity, and tobacco use disorder. Id. at 353. Over the next two years, Plaintiff continued to see Dr. Lamanna, and more frequently, a nurse practitioner who worked for her. For instance, on August 21, 2014, Ms. Scalzo conducted an exam that revealed "moderate tenderness of the left spine thoracic/lumbar region with radiation down left leg." Id. at 562 On September 22, 2014, Karen Pulvino, another nurse practitioner working for Dr. Lamanna, noted that due to a misunderstanding with a doctor, Plaintiff had independently purchased a cane months earlier but now had a cane prescribed. Id. at 532. On July 29, 2015, Plaintiff saw Dr. Lamanna, who noted that Plaintiff showed "no signs of

7

acute distress" and "no apparent discomfort" but also exhibited "poor sitting posture," stood "slowly and gradually straighten[ed] up" and "walk[ed] wide legged." Id. at 585. A toxicology report from that same date was negative for all illicit substances. Id. at 605.

Plaintiff also saw Dr. Sebastian Thomas on February 26, 2014, who diagnosed her with chronic back pain. R. at 556–57. Dr. Thomas noted that Plaintiff "walk[ed] with a slight limp favoring right side," is "[s]low to rise from chair," and had less of a limp when "distracted and talking." Id. In March 2014, Plaintiff saw Dr. Vandana Sharma for pain management. Dr. Sharma noted that Plaintiff "walk[ed] extremely slowly to the exam room" and "appear[ed] to have a difficult time sitting in the exam chair." Id. at 553. Dr. Sharma assessed Plaintiff as having lumbar radiculopathy. Id. at 555.

On multiple occasions in 2014 and 2015, Plaintiff saw Susanne Bauer, a licensed clinical social worker, who noted that Plaintiff had issues with interpersonal relationships. Ms. Bauer eventually referred Plaintiff to rehabilitation services to address substance abuse issues. Id. at 540.

**b. Opinion evidence and the ALJ Decision**

On September 23, 2016, ALJ Gregory M. Hamel issued a decision finding Plaintiff was not disabled from February 8, 2013 through the date of the decision. R. at 29. In coming to this conclusion, the ALJ made several findings.

First, the ALJ found that Plaintiff met the SSA's insured status requirements and had not engaged in substantial gainful activity since the February 8, 2013. R. at 17. Next, the ALJ found that Plaintiff had the following severe impairments: low back and lower extremity pain associated with chronic pain syndrome, obesity, history of monocular vision, unspecified bipolar and related disorders, unspecified anxiety disorder, mood disorder, and borderline personality disorder. Id. at 18. The ALJ then determined that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Id. at 18.

Next, the ALJ found that Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; cannot climb ladders, ropes, or scaffolds; cannot work in hazardous environments; and she can perform only routine and repetitive tasks which do not require more than occasional public contact or more than occasional contact with coworkers." R. at 21. In making this determination, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with or well supported by the medical evidence and other evidence in the record." Id. at 22. The ALJ noted that there were some reports she had been non-compliant with treatment, that she smokes cigarettes, and that she has not pursued any aggressive therapies. Id. Further, the ALJ noted that Plaintiff:

> seems quite active, assisting with household chores and cooking, driving regularly, caring for her young son, and taking her son to karate class. This level of activity, though not conclusive as to any issue, is consistent with the residual functional capacity as found. However, she tended to downplay her activities at hearing and her testimony contradicted some of her written statements. Specifically, at [the] hearing she indicated that her father does all the cooking. However, by written statement she stated that she can cook a full dinner, but other days she prepares a sandwich. She also noted by written statement that she shops for food, clothing and all necessities one to two times a week for three to four hours, but at [the] hearing she indicated that she only shops briefly at a convenience store.

Id.

9

The ALJ also weighed the opinion evidence to determine Plaintiff's RFC. First—and at issue in this appeal and discussed in more depth below—the ALJ gave little weight to the opinions of treating physician Dr. Lamanna and nurse practitioner Linda Bellefeuille.

The ALJ gave great weight, however, to consultative examiner Dr. Kalyani Ganesh's view that Plaintiff could perform at least light work and had "no gross limitation in sitting, standing, and walking and she has only a mild limitation in lifting, carrying, pushing, and pulling." R. at 25 (citing R. at 428). Dr. Ganesh based this opinion on a September 9, 2015, consultative examination, in which Dr. Ganesh noted that Plaintiff had normal gait and needed no help changing for the exam, but could not walk on her heels or toes, could not squat, and used a cane. Id. at 426–27. The ALJ gave less weight to Dr. Ganesh's findings to the extent they suggested Plaintiff could do more than light work. Id.

The ALJ gave no significant weight to nurse practitioner Jill Malihowski and Dr. Mary Trusilo's suggestion that Plaintiff had 25 to 50 percent impairment in December 2010 and 50 percent impairment in March 2011 because this was before the alleged onset date. R. at 25. The ALJ similarly gave little weight to several other medical opinions that preceded the alleged onset date. Id.

The ALJ gave great weight to consultative examiner Dennis Noia, Ph.D. to the extent that his findings suggested Plaintiff could perform routine and repetitive tasks. This was based on Dr. Noia's conclusion that Plaintiff had:

> no limitations in understanding and following simple instructions and directions . . . no limitations performing simple tasks . . . no limitations maintaining attention and concentration for tasks . . . no limitations regarding her ability to attend to a routine and maintain a schedule . . . no limitations regarding her ability to learn new tasks . . . no limitations regarding her ability to make appropriate decisions . . . no psychiatric limitations performing complex

10

> tasks . . . [and] that she appears to be able to relate to and interact
> moderately well with others.

R. at 26 (citing R. at 423). The ALJ gave less weight to Dr. Noia's opinion that Plaintiff has "less than moderate limitations in social interaction and concentration, persistence, or pace" because this was "out of proportion to the medical records as a whole and the claimant's testimony and her own description of her activities suggests that she is more limited in this regard." Id. at 26.

Next, the ALJ determined Plaintiff was unable to perform any past relevant work as a developmental aide. R. at 27. Finally, the ALJ determined, based on Plaintiff's age, education, work experience, and RFC, that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. R. at 28. The ALJ based this on the testimony of a vocational expert ("VE"), who stated Plaintiff could work in occupations such as a housekeeping cleaner or packager. Id. Because there were jobs that Plaintiff could perform, the ALJ held that Plaintiff had not been under a disability from February 8, 2013 through the date of the decision, September 23, 2016. Id. at 29.

The Appeals Council denied Plaintiff's request for review. R. at 1–6.

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in two ways: (1) Plaintiff's RFC is not supported by substantial evidence because the ALJ did not adequately consider the severity of Plaintiff's mental and visual impairments; and (2) the ALJ improperly weighed the opinion evidence. Pl.'s Br. at 14–19.

### A. The ALJ's Consideration of Plaintiff's Mental and Visual Impairments

Plaintiff argues that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence because it fails to factor in Plaintiff's limitations as to concentration, persistence, and pace, as well as Plaintiff's monocular vision.

11

*1. Mental limitations: concentration, persistence, and pace*

During step three of his analysis, the ALJ found that Plaintiff had a moderate impairment in the functional area of concentration, persistence, or pace—especially because Plaintiff is distracted by pain. R. at 19. Later, the ALJ limited Plaintiff's RFC to "only routine and repetitive tasks which do not require more than occasional public contact or more than occasional contact with coworkers." Id. at 21. Plaintiff argues that in determining this limitation on Plaintiff's RFC, the ALJ insufficiently considered Plaintiff's moderate limitations in the area of concentration, persistence, and pace. The Court agrees.

"[W]hen making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work." Thompson v. Astrue, No. 10-CV-6576, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012); see also Karabinas v. Colvin, 16 F. Supp. 3d 206, 215 (W.D.N.Y. 2014) (noting that SSR 96–8p requires this "detailed assessment"). "[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Steffens v. Colvin, No. 14-CV-6727, 2015 WL 9217058, at *4 (W.D.N.Y. Dec. 16, 2015) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). In Steffens, for instance, the court noted that there was evidence that "despite deficits in attention and concentration, plaintiff could perform simple (and even complex) tasks, could maintain attention and concentration in a one-on-one setting (i.e., he could stay on task), and could maintain a regular schedule." 2015 WL 9217058, at *4. Here, in contrast the ALJ did not specifically discuss how Plaintiff's limitations as to concentration, persistence, and pace factored into Plaintiff's RFC. R. at 21–29; see also id. at 104–08.

Defendant argues that moderate mental limitations do not necessarily prevent a claimant from performing unskilled work. Def.'s Br. at 6; see Martinez v. Comm'r of Soc. Sec., No. 16-

CV-908, 2017 WL 2633532, at *7 (N.D.N.Y. June 15, 2017) (noting that the ALJ's RFC determination for unskilled work is not inconsistent with moderate limitations in mental functioning."). Defendant points to mental status examinations that note Plaintiff has intact judgment and insight; logical thoughts; no evidence of delusion; and normal judgment, memory, attention, and concentration. Def.'s Br. at 5. And the ALJ did give great weight to Dr. Noia's findings that Plaintiff had no limitations as to attention, concentration, and attending to a routine. R. at 26.

This is insufficient, however, because the ALJ offered no explanation as to how Plaintiff's limitations as to concentration, persistence, and pace may or may not have impacted Plaintiff's RFC. The "ALJ is required to 'both identify evidence that supports his conclusion and build an accurate and logical bridge from that evidence to his conclusion.'" Doxey v. Comm'r of Soc. Sec., No. 17-CV-1036, 2019 WL 2325076, at *6 (W.D.N.Y. May 31, 2019) (quoting Perry v. Berryhill, 2019 WL 1092627, at *2 (4th Cir. Mar. 8, 2019)); see also Mascio 780 F.3d at 638 ("Perhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert . . . But because the ALJ here gave no explanation, a remand is in order.").

It should be noted, however, that the ALJ was not required to explicitly discuss how every limitation impacts Plaintiff's RFC. "Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such

13

that additional analysis would be unnecessary or superfluous . . . remand is not necessary merely because an explicit function-by-function analysis was not performed." Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013). In Diakogiannis v. Astrue, 975 F. Supp. 2d 299 (W.D.N.Y. 2013), for instance, the court found that, despite the lack of a function-by-function assessment, an ALJ's conclusion that the claimant was able to perform simple, routine, and repetitive tasks was consistent with the ALJ's findings about claimant's mental limitations, which included moderate difficulties with concentration, persistence, and pace. Id. at 315.

However, Defendant's reliance on Diakogiannis is misplaced. In limiting the claimant to simple, routine, and repetitive tasks, the ALJ in that case also noted that the claimant could not perform production rate or pace work—a limitation the ALJ in this case did not impose on Plaintiff. Id. This limitation indicates that the ALJ in Diakogiannis, unlike the ALJ here, considered and incorporated the claimant's limitations as to concentration, persistence, and pace.

Likewise, in McIntyre v. Colvin, 758 F.3d 146 (2d Cir. 2014), while the court upheld an ALJ's RFC determination despite lack of explicit consideration of the claimant's moderate limitations as to concentration, persistence, and pace, its reasoning suggests the opposite outcome here. Id. at 150. In that case, the ALJ based the limitation solely on Plaintiff's difficulty sleeping, and there was "nothing in the record to suggest that Plaintiff's difficulty sleeping . . . render[ed] her incapable of simple, routine, low stress tasks." McIntyre v. Colvin, No. 12-CV-318, 2013 WL 2237828, at *5 (N.D.N.Y. May 21, 2013), aff'd, 758 F.3d 146 (2d Cir. 2014). Here, in contrast, Plaintiff's limitations as to concentration, persistence, and pace are present at least in part because Plaintiff is distracted by pain, R. at 19, and the record is replete with evidence that pain impacts Plaintiff's ability to complete routine tasks. See, e.g., R. at 84–85 (testifying that Plaintiff has trouble washing dishes, watching television, and socializing).

Perhaps the ALJ determined that Dr. Noia's testimony about Plaintiff's ability to concentrate outweighed any limitation caused by pain, but in the absence of any such justification, the Court is unable to conclude that Plaintiff's RFC is consistent with her well documented limitations.[2]

As the Second Circuit has noted, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Cichocki, 729 F.3d at 177. Because it is not apparent the ALJ factored Plaintiff's limitations into her RFC—and especially because there is significant evidence documenting those limitations—the Court finds that Plaintiff's RFC is not supported by substantial evidence and that the case must be remanded for further consideration.

2. *Visual impairments: monocular vision*

Plaintiff, who has had monocular vision from birth, claims that the ALJ failed to include visual limitations in the RFC or the questions posed to the VE. Plaintiff notes that the job of a packager, which the VE identified as a potential occupation for Plaintiff, R. at 28, requires "frequent near acuity and accommodation." Pl.'s Mem. at 18. However, as Defendant argues, Plaintiff failed to demonstrate how her monocular vision impacts her RFC. "The mere presence of a disease or impairment alone, of course, is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations which it may impose upon the ability to perform basic work functions, that is pivotal to the disability inquiry." Proper v. Astrue, No. 10-CV-1221, 2012 WL 1085812, at *6 (N.D.N.Y. Feb. 28, 2012), report and recommendation adopted, No. 10-CV-1221, 2012 WL 1085810 (N.D.N.Y. Mar. 30, 2012). While Plaintiff's

---

[2] This is especially so because the ALJ explicitly discounted Dr. Noia's opinion to the extent it suggested Plaintiff had less than moderate limitations in concentration, persistence, or pace. R. at 26.

monocular vision is documented in the record, see, e.g., R. at 565, Plaintiff is unable to point to any documentation of how her vision impacts her RFC.[3] Plaintiff relies on Nunez v. Barnhart, No. 01-CV-5714, 2002 WL 31010291 (E.D.N.Y. Sept. 9, 2002) to assert that the ALJ should have asked the VE in depth questions about Plaintiff's vision. But in that case, unlike here, the claimant's treating eye doctor had documented the limitations resulting from the condition, stating that claimant was "a 'one-eyed patient' whose 'poor vision would preclude [him] from any type of work that would require good eyesight.'" Id. at *1. Because no such limitations are documented here, the ALJ did not err in this regard.[4]

**B. Weight afforded to opinion evidence**

Plaintiff argues that the ALJ improperly gave "little weight" to the opinions of Plaintiff's treating physician, Dr. Suzanne Lamanna, and her colleague, nurse practitioner Linda Bellefeuille. Pl.'s Br. at 17; R. at 26.

Under SSA regulations, a "treating source" is a claimant's "own acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." § 404.1527(c)(2). "[O]pinions from [a claimant's] treating sources" are given "more weight"

---

[3] Dr. Ganesh noted Plaintiff's monocular vision and identified no specific limitations. R. at 25. The ALJ gave less weight to this portion of Dr. Ganesh's opinion and found Plaintiff had "limitation to hazards." Id. Plaintiff does not appear to argue that the ALJ failed to incorporate this particular limitation to hazards into Plaintiff's RFC or VE questioning.

[4] Even if the Court were to accept Plaintiff's argument that her vision is not sufficient to perform the job of a packager, Plaintiff did not argue that her vision also prevents her from working as a housekeeping cleaner, which the VE also identified as a potential occupation for Plaintiff. See McQuaid v. Astrue, No. 11-CV-801, 2012 WL 5472300, at *5 (N.D.N.Y. Nov. 9, 2012) ("[T]he finding of one job is sufficient to demonstrate that there is other work that [Plaintiff] could perform.").

16

than other sources, and are given "controlling weight" when the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record. Id. This regulation ensures that the ALJ defers to the findings of the medical sources "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." Id.

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. §§ 404.1527(c)(2), 416.927(c)(2); Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993). The Second Circuit has noted that it "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)). Factors that indicate the weight to be accorded to the treating physician include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2).

The ALJ gave little weight to several opinions by Dr. Lamanna and Ms. Bellefeuille, including:

> "that [Plaintiff] is unable to meet competitive standards in several categories due to limitations in her mental abilities in the areas of maintaining regular attendance, sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without unreasonable number and length of rest periods, traveling in an unfamiliar place, and using public transportation . . . that [Plaintiff] can sit less than two hours in an 8-hour day, stand/walk less than two hours in an 8-hour day, can rarely lift and carry fewer than ten pounds, never perform postural activities, and can only occasionally reach . . . needs to take unscheduled breaks every 20 minutes for

17

> five minutes . . . cannot walk, lift, stand or sit for a reasonable amount of time . . . [and] would be off task more than 20 percent during an 8-hour workday and would be absent from work more than four days per month.

R. at 25–26.

The ALJ gave these statements little weight because "these statements are out of proportion and not well supported by the treatments notes of Dr. Lamanna and Ms. Bellefeuille." R. at 26. Specifically, the ALJ noted:

> Dr. Lamanna and Ms. Bellefeuille have consistently reported no significant deficits in gait, motor strength, range of motion, reflexes, or sensation . . . Dr. Lamanna noted in December 2015, that the claimant denied psychiatric symptoms and she was given no particular assessment in this regard . . . as recently as August 2016 Ms. Bellefeuille concluded that the claimant had no apparent anxiety, depression, or agitations and her affect was described as normal and appropriate. Her attention was also within normal limits and her memory was grossly intact.

Id.

The ALJ was correct to discount the opinions of Plaintiff's treating source for these inconsistencies. As Defendant notes, from May 2014 through July 2016, the examination findings of Dr. Lamanna and nurse practitioners Pulvini and Scalzo consistently showed that while Plaintiff had tenderness in her spine, she had full range of neck motion, normal gait, and full range of motion and full strength throughout her extremities. Def.'s Mem. at 9; R. at 340, 348, 352, 356, 361, 368. But see R. at 344 (noting that Plaintiff "walks with a limping and slow gait"). These examinations also noted that Plaintiff was cooperative, neurologically intact, and had normal attention. Def.'s Mem. at 9; T at 340, 344, 348, 352, 355–56, 361, 364–65. These records appear to stand in contrast to the opinion that Plaintiff, among other things, would be off task more than 20% during an eight-hour workday, would be absent from work more than four days per month, could sit less than two hours in an eight-hour workday, and could rarely lift and carry fewer than ten pounds. The ALJ properly gave these opinions little weight. See Jones v.

Colvin, No. 16-CV-443, 2017 WL 758511, at *4 (N.D.N.Y. Feb. 27, 2017) (affirming ALJ's finding that treating physician's opinion was not credible in part because the treating physician's "assessment is not supported by the objective medical evidence or even by his own treatment records").

While the ALJ's analysis does not methodically go through each individual factor set forth in 20 C.F.R. § 404.1527(c)—length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization—it is clear the ALJ sufficiently considered the relevant issues. "[I]t is well established that where an ALJ's reasoning and adherence to the Regulations is clear, he is not required to explicitly go through each and every factor of the Regulation." Leonard v. Comm'r of Soc. Sec., No. 14-CV-1353, 2016 WL 3511780, at *3 (N.D.N.Y. May 19, 2016), report and recommendation adopted sub nom. Leonard v. Colvin, No. 14-CV-1353, 2016 WL 3512219 (N.D.N.Y. June 22, 2016); see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."). The ALJ noted that Dr. Lamanna only saw Plaintiff once every six months, and the ALJ's references to the medical records show he was aware of the frequency and length of treatment. See Jones, 2017 WL 758511, at *4 ("[T]he ALJ's reference to these varying treatment records acknowledges the length and frequency of [the treating physician's] treatment relationship with plaintiff."). The ALJ's discussion of the medical record—and its contrast to Dr. Lamanna and Ms. Bellefeuille's opinions—similarly demonstrates the ALJ's consideration of the supportability and consistency factors. And Plaintiff does not argue, nor does the record suggest, that the ALJ failed to consider that Dr. Lamanna had

19

any relevant specialty. Thus, the ALJ did not err in giving Dr. Lamanna and Ms. Bellefeuille's opinions little weight.[5]

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's determination of no disability is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order in which the ALJ should assess how Plaintiff's limitations as to concentration, persistence, and pace impact her RFC; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: September 16, 2019
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge

---

[5] Plaintiff appears to take issue with the ALJ's statement that "Ms. Bellefeuille is not an acceptable medical source," R. at 26, despite the "undisputed co-signature of Dr. Lamanna." Pl.'s Mem. at 18. But Plaintiff makes no further argument on this issue and, in any event, the Court finds that the ALJ properly discounted Dr. Lamanna and Ms. Bellefeuille's opinions for the reasons discussed above.